### (1) KIRK *v.* HIGH, No. 9154.

### (2) MITCHELL *v.* HAMBY, No. 9152.

### Opinion delivered June 29, 1925.

1. EVIDENCE—JUDICIAL NOTICE.—It is a matter of common knowledge that there is no county in the State which could build a courthouse or jail sufficient for use as such out of revenues for any single year.

2. COUNTIES—LIMIT OF EXPENDITURES.—Under Amendment 11 to the Constitution providing that the fiscal affairs of counties shall be conducted on a sound financial basis and prohibiting county officers from making contracts or allowances in excess of the revenue for the fiscal year, any payment which a county makes for any purpose during the year is part of the expense for that year; and where the total revenues have been appropriated and disbursed, the expenditures must cease, and the officer who overdraws does so at his peril.

3. COUNTIES—LIMIT OF EXPENDITURES—COURTHOUSES AND JAILS.—Amendment 11, prohibiting expenditures by counties in excess of revenues for the fiscal year, *held* not to prohibit the building of courthouses and jails by counties because such buildings exceed the yearly revenues in total cost, but to require only that the cost thereof be so apportioned over a term of years that such cost apportioned to each year, together with other governmental expenditure, shall not exceed the yearly revenue.

(1) Appeal from Lonoke Chancery Court, *John E. Martineau,* Chancellor; affirmed.

(2) Appeal from Nevada Chancery Court; *C. E. Johnson,* Chancellor reversed.

*Trimble & Trimble,* for appellant Kirk.

*W. J. Waggoner* and *Chas. A. Walls,* for appellee High.

*Dexter Bush,* for appellant Mitchell.

*Randolph P. Hamby,* for appellee Hamby.

SMITH, J.   Case No. 9154 is the suit of a citizen and taxpayer of Lonoke County, who, for the benefit of himself and all other taxpayers of that county, filed a complaint, in which he alleged that the county judge and three other citizens of the county are the duly qualified commissioners for the construction of a courthouse for that county.   It was alleged that at the regular term of the quorum court of Lonoke County it had been unanimously voted to erect a courthouse at a cost not to exceed $150,000, the same to be paid for in not to exceed twenty annual installments not exceeding $10,000 in any one year, and the sum of $10,000 was appropriated to be paid out of the revenues of 1924 as the first payment.   It was alleged that the quorum court of the county had pledged the faith and credit of the county to set aside not to exceed one mill, or so much thereof as was necessary, of the annual five-mill tax for county purposes to meet the annual appropriation to be made under the terms of the resolution of the quorum court which directed the county judge, in conjunction with the commissioners, to execute a contract for the construction of the courthouse.   It was further alleged that the total assessed value of the real and personal property is approximately ten million dollars, and that the five-mill tax for county general purposes would yield only about $50,000 per year, and the one-mill pledged to be used for the payment of the annual appropriation to build the court house will yield only about $10,000, and that the county's total revenues from all other additional sources is only $10,000 per annum. It was further alleged that, notwithstanding these facts, the commissioners proposed to let a contract for the construction of a building the cost of which may

amount to $150,000, and that the contract will be let unless they are enjoined from so doing. There was a prayer that the commissioners be enjoined from entering into the proposed contract.

A demurrer to this complaint was filed and sustained, and the taxpayer has appealed.

In case No. 9152 a citizen of Nevada County sought to enjoin the construction of a jail in that county, and the complaint filed by him contains allegations raising the same question as is presented in the Lonoke County case. A demurrer to this complaint was filed and overruled, and the commissioners stood on their demurrer and have appealed.

The same question is therefore presented in both appeals, and a single opinion will suffice to dispose of both cases.

The controlling question in the case is the effect of the adoption of the Eleventh Amendment to the Constitution of the State. This amendment was adopted by the people at the general election of 1924, as declared by the court in the case of *Brickhouse* v. *Hill,* 167 Ark. 513.

This amendment was adopted as an amendment to section 4 of article 12 of the Constitution, and the portion thereof relevant to the facts involved in the pending appeals reads as follows: ''The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made; nor shall any county judge, county clerk, or any other county officer, sign or issue any scrip warrant or make any allowance in excess of the revenue from all sources for the current fiscal year; nor shall any city council, board of aldermen, board of public affairs, or commissioners, of any city of the first or

second class, or any incorporated town, enter into any contract or make any allowance for any purpose whatsoever, or authorize the issuance of any contract or warrants, scrip or other evidence of indebtedness in excess of the revenue for such city or town for the current fiscal year; nor shall any mayor, city clerk, or recorder, or any other officer or officers, however designated, of any city of the first or second class or incorporated town, sign or issue any scrip, warrant or other certificate of indebtedness in excess of the revenue from all sources for the current fiscal year.''

Other portions of the amendment provide that the counties, cities and incorporated towns of the State may pay their outstanding indebtedness by issuing negotiable bonds and, after authorizing that action, it is further provided that ''Where the annual report of any city or county in the State of Arkansas shows that scrip, warrants or other certificates of indebtedness had been issued in excess of the total revenue for that year, the officer or officers of the county or city or incorporated town who authorized, signed or issued such scrip, warrants or other certificates of indebtedness shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be fined in any sum not less than five hundred dollars nor more than ten thousand dollars, and shall be removed from office.''

Does this amendment operate to prohibit the counties of the State from building courthouses and jails where the cost of such buildings would exceed the sum that can be appropriated and paid in any one year out of county funds for such purposes?

We think the purposes of this amendment were, first, to enable the cities, counties and incorporated towns of the State to pay their outstanding indebtedness by an issue of bonds; in other words, to get on a cash basis; and the second purpose was to prevent the counties, cities and towns of the State from accumulating a floating debt which could not be paid out of the total

revenues of the fiscal year, that is, the obligations payable in a given year must not exceed the revenues of that year.

But does this mean that courthouses or jails cannot be erected unless the total cost of the construction can be paid out of the revenues of a single year? We think not.

The rule by which amendments to the Constitution are to be construed was stated in the case of *Hodges* v. *Dawdy*, 104 Ark. 583, where it was said: "The amendment being the last expression of the popular will in shaping the organic law of the State, all provisions of the Constitution which are necessarily repugnant thereto must, of course, yield, and all others remain in force. It is simply fitted into the existing Constitution, the same as any other amendment, displacing only such provisions as are found to be inconsistent with it. Like any other new enactment, it is a 'fresh drop added to the yielding mass of the prior law, to be mingled by interpretation with it.' *State* v. *Sewell*, 45 Ark. 387. In the construction of its terms, and in the determination of its scope and effect, the courts should follow settled rules of interpretation."

In the application of this rule of construction the court refused to give a literal reading to certain phrases appearing in the amendment which was there construed, and assigned as the reason for so doing that "such a construction leads to an absurdity, and must be rejected for that reason. *State* v. *Smith*, 40 Ark. 431."

It is a matter of common knowledge, known to every citizen, that there is possibly no county in the State which could build a courthouse sufficient for use as such and pay for it out of the revenues of any single year. This could certainly not be done if the county paid the other ordinary and inevitable expenses of government. The same thing is no doubt true as to many counties in the matter of building jails.

These are unusual and extraordinary expenses, They are not incurred annually. Ordinarily, courthouses and jails answer the purposes for which they were constructed for many years. They are essential to the discharge of the functions for which counties are created. It is not likely that any county in the State has ever, or will ever, pay the total cost of a courthouse out of the revenues of the county for a single year.

As was said by CHIEF JUSTICE BUNN in the case of *Hilliard* v. *Bunker,* 68 Ark. 340. "In such an expensive matter as the building of a courthouse and jail, it is not of course expected, under ordinary circumstances, to cover the whole amount by the levy for one year, and in fact this cannot be done, since, together with the ordinary expenses of the county, the levy for erecting these buildings must not exceed in one year the rate of 5 mills. The amount and number of the annual installments necessary to cover the whole cost of the structure must be and is left to the discretion of the levying court, to be exercised so as to accomplish the result intended in a reasonable time."

This language was quoted and approved in the recent case of *Shoffner* v. *Dowell.* 168 Ark. 229, but, as that case originated before the adoption of amendment No. 11, all that was there said is not applicable here.

Any payment a county makes for any purpose during any year is a part of the expense of that year, and where the total revenues have been appropriated and disbursed, expenditures must cease. The fiscal officer of the county, city or town whose duty it is to draw a warrant upon which the revenues would be paid out must cease drawing warrants under penalty of a fine and forfeiture of his office when warrants have been drawn in a sum sufficient to exceed the revenues of a particular year. He overdraws at his peril.

But this inhibition is not to be read too literally. A literal reading would prevent the expenditure of sur-

plus revenue which might be accumulated by a county, city or town, to construct a building the cost of which would exceed the revenue of a single year, for the penalty of the statute falls ''where the annual report  *  *  * shows that scrip warrants or other certificates of indebtedness had been issued in excess of the total revenue for that year.''

If the amendment is read literally, it would be fruitless for a county, city or town to accumulate a surplus to erect a building which would exceed, with other necessary expenditures, the revenues of a single year, for, if the annual report which the amendment requires shows that this has been done, the officer upon whose warrant the money was disbursed would forfeit his office and be subject to a fine.

We think the amendment means just this: that, if a county, city or town avails itself of the provision authorizing the taking up of its outstanding indebtedness, it shall not thereafter draw warrants upon the treasurer for an amount in excess of its annual revenues. It must stay out of debt. It means further that, if a city, county or town has any outstanding unpaid warrants which it does not take up by issuing bonds as authorized by the amendment, it must not add to its existing indebtedness by issuing more warrants than can be paid out of the revenues of the current year.

But it does not mean that the county without a courthouse or a jail must dispense with these essentials because they cannot be fully paid for in one year. Counties may contract for these buildings and may apportion the cost over a number of years, but in doing so the other necessary expenses of government must be taken into account, and no authority be conferred upon the officers charged with the duty of issuing vouchers or warrants to issue them for a sum which will exceed the total revenues for any single year.

ARK.]          (1) KIRK v. HIGH, No. 9154.·          159

For instance, if Lonoke County has revenues not exceeding $60,000, and proposes to expend $10,000 a year on a courthouse, then all other expenditures must not exceed $50,000 per year. The sum to be paid in a particular year is "the contract or allowance" for that year, and must be shown in the annual report which the amendment requires the counties, cities and towns to make, and this contract or allowance must not, with all other contracts or allowances payable that year, be "in excess of the revenues from all sources for the fiscal year in which said contract or allowance is made." But, subject to this limitation as to payment, we do not think the amendment requires counties having no courthouses or jails to attempt to function without them, and the counties may therefore contract for their construction, provided no obligation is incurred to pay a sum of money exceeding—in addition to other expenditures —the total revenues of the year in which a particular payment is to be made.

It follows, from what we have said, that the decree in the Lonoke County case will be affirmed, and the one in the Nevada County case will be reversed.

The CHIEF JUSTICE dissents, and MR. JUSTICE HART concurs.

HART, J. (concurring). It has been aptly said that State Constitutions are framed for the very purpose of adaptation to the progress of the times and to be a general, not special, rule of action and restraint.

While it is true that in interpreting a Constitution it is to be read as it is written, still the Constitution and the amendments thereto must be so interpreted as to give effect to every part thereof and leave each part some office to perform. It is a primary rule of construction that the Constitution must be considered as a whole, and to get at the meaning of any part of it, we must read it in the light of other provisions relating to the same subject. *Little Rock* v. *North Little Rock*, 72 Ark. 195, and *State* v. *Clay County*, 93 Ark. 228

No interpretation of the amendment under consideration in this case should be allowed which would conflict with any other provision of the Constitution unless it is absolutely necessary in order to give effect to the amendment. On the other hand, such construction should be given as will, if possible leave all the other provisions of the Constitution unimpaired and in full force. *State* v. *Donaghey*, 106 Ark. 56.

In *People* v. *Potter,* 47 N. Y. 375, the idea is clearly expressed by Judge Folger as follows: ''The intent of the lawmaker is to be sought for. When it is discovered, it is to prevail over the literal meaning of the words of any part of the law. And this intent is to be discovered, not alone by considering the words of any part, but by ascertaining the general purpose of the whole, and by considering the evil which existed calling for the new enactment, and the remedy which is sought to be applied. And when the intent of the whole is discovered, no part is to be so construed as that the general purpose shall be thwarted, but all is to be made to conform to reason and good discretion. And the same rules apply to the construction of a Constitution as to that of a statute law.''

The same general rule was also clearly and concisely stated by Mr. Justice WALKER in *State* v. *Scott,* 9 Ark. 270, as follows: ''In determining the intentions of the framers of the amendment, we must keep in view the Constitution as it stood at the time the amendment was made, the evil to be remedied by the amendment, and the amendment proposed, by which the evil is to be remedied. No interpretation should be allowed which would conflict with any other provision of the Constitution, or which is not absolutely necessary in order to give effect to the proposed amendment. On the contrary, such construction should be given as will, if possible, leave all the other provisions in the Constitution unimpaired and in full force.''

The above was quoted and approved in *Ferrell* v. *Keel,* 105 Ark. 380.

In the application of these established rules of construction it will be remembered that article 13 of our Constitution is devoted to counties, county seats, and county lines. Counties are civil divisions of the State for political and judicial purposes, and are its auxiliaries and instrumentalities in the administration of its government. *Cole* v. *White County*, 32 Ark. 45 and cases cited. Throughout the Constitution, counties are recognized in various ways as civil divisions of the State for political and judicial purposes. Counties are made the units of government for legislative, administrative and judicial purposes.

Court houses and jails are absolutely necessary in the administration of the State government, and I do not think that the amendment under consideration was designed to take away the powers in the respect to repairing and erecting courthouses and jails, which were possessed before its adoption. I think such an interpretation of the amendment would be too narrow and literal, and would tend to defeat the very purposes which it was designed to effectuate. Therefore, I think that the power to construct courthouses and jails is unchanged by the amendment.

McCulloch, C. J., (dissenting). I am not sure whether the opinion of the majority should be construed to mean that the construction of courthouses and jails is exempt from the restrictions found in amendment No. 11, or whether the words, "make or authorized any contract or make any allowance," are held to be synonymous with the words, "sign or issue any scrip, warrant or make any allowance," so as merely to prohibit the issuance or the making of allowances. There is reference throughout the opinion to the construction of court houses and jails, as if those expenses were to be treated as exempt from the operation of amendment No. 11. But near the conclusion of the opinion the court seems to treat the different words of restriction as synonymous, and to hold that the restriction applies only to the making

of allowances or issuance of warrants during a given fiscal year, and not to the making of contracts for payments extending over a series of years. I do not agree to either of those theories, for I can find in the constitutional amendment no exemption whatever of any kind of expense, and it seems to me that the language is too broad and emphatic to restrict the prohibition to the mere allowance of claims and the issuance of warrants thereon. The language not only fails to mention any exemptions from its operations, but on the contrary it contains words of great emphasis in applying the restriction to contracts or allowances "for any purpose whatever," showing that the framers of the amendment intended no exemption. If, forsooth, there are any exemptions, I scarcely see how they can be limited to the cost of constructing court houses and jails, for there are other public buildings in counties and municipalities which are just as essential to orderly government and to the protection of the health and welfare of the people. Other emergencies may arise which are just as important as the construction of court houses and jails. Then why should there be declared an implied exemption as to court houses and jails? There is not a word anywhere in the Constitution with reference to the construction either of court houses or jails. However essential those buildings are to government, the construction and maintenance of them is treated, by silence on the subject, merely the same as other expenses.

The case of *Hilliard* v. *Bunker*, 68 Ark. 340 (cited by the majority and which merely followed the decision in *Durritt* v. *Buxton*, 63 Ark. 397), involved the construction of statutes, to determine whether a general statute repealed a prior special one, and the decision has no bearing, I think, on the interpretation of amendment No. 11.

The Constitution of 1874 restricted taxation in counties to one-half of one per cent. "for all purposes." If the cost of construction of court houses and jails is

exempt from the operation of amendment No. 11, then it can be urged with equal force that those extraordinary expenses of government are exempt from the operation of the constitutional restriction as to the amount of taxes; and yet never once during the fifty years since the adoption of the Constitution of 1874 and amidst all the difficulties encountered since then in the construction of public buildings by counties, has any one appeared with spirit so bold as to make any such contention. The counties have all built court houses and jails without violating the Constitution with respect to the limit of taxation.

Turning to the other thought expressed in the opinion of the majority, namely, that the language of the amendment permits the making of contracts for the construction of court houses and jails, if the cost is spread over a term of years so as to limit the total expense each year to the revenues thereof, it seems to me that the position of the majority is equally untenable. If contracts may thus be made for the construction of court houses and jails, why may not any other contract for legitimate expenses be made, regardless of cost, if it is spread over a term of years? If, in other words, the prohibition extends only to the allowance of claims for the issuance of warrants, why cannot such a contract be made for any other legitimate expense? There is no distinction, as I have already said, to be found in the language of the amendment. If that interpretation of the contract is true, then the county court or town council can make as many contracts as they see fit for future payments, thus incurring unlimited obligations, if they do not make allowances or issue warrants in excess of the revenues for the fiscal year. With all respect for the opinion of my brethren, I cannot bring myself to believe that the framers of the Constitution intended any such result. It is contrary, I think, to the plainest sort of language used. That interpretation eliminates the word "contract" entirely from the amendment and gives no force or meaning to it whatever. I see no escape from

the conclusion that the language of the amendment plainly means just what it says—that no contract nor any allowances nor any issuance of warrants shall be made during the fiscal year in excess of the revenues for that year. It means that counties and municipalities that are to be lifted out of debt by the provisions of this amendment must stay out of debt—must not incur indebtedness for any purpose whatever in excess of the revenues for the fiscal year. Now, a valid contract creates an obligation—a debt—no matter when it is payable. The debt is not paid by postponement. It still remains an obligation. Let us consider for a moment the illustration made by the majority in the conclusion of the opinion. When Lonoke County turns into the second fiscal year after making the contract for the construction of the court house, the contractor immediately presents to the county court his claim for the second payment of $10,000. He has a legal right to do that under the opinion of the majority, and the county court is bound to issue him a warrant, regardless of other anticipated expenses. If the contract thus made is valid, the county court can be compelled to allow the claim and issue a warrant therefor. The result will be that the restriction is not placed upon the allowance for the cost of the court house, but it restricts the amount of general expenses of the county, regardless of the necessities which may subsequently arise. In other words, under the restriction made by the majority in the opinion, the county cannot expend more than $50,000, regardless of necessities. It is thus seen that this contract for future payment supplants the payment of ordinary expenses, and, after all, leaves the county in debt. But the illustration made by the majority is not apt for the reason that, if there is no constitutional restriction upon the making of a contract for future payments, then it is within the power of the county court to make any contract for future payment regardless of amount, and the only restriction upon the allowance of the

claim in future years is the total amount of revenues for that fiscal year. It is therefore within the power of the county court to burden the county for debts payable in the future which would exclude all other necessary expenses of the county. It cannot be determined or even estimated, until the assessments are made and taxes levied, what the revenues for a fiscal year will be; that is only determined by an ascertainment of the total amount of the assessments when the quorum court meets, and there is a levy of taxes to meet the appropriation. How can it be known in future years what the amount of the revenues is going to be? It is thus seen that this interpretation of the language of the Constitution involves us in a mass of uncertainty, which clearly demonstrates to my mind that the framers of the amendment never intended any such result, but, on the contrary, they used plain language which means just what it says.

The majority seek justification for a departure from a literal application of the language of the amendment by saying that "it would prevent the expenditure of surplus revenue by a county, city or town to construct a building which would exceed the revenue of a single year." I scarcely think that any one would put such a narrow construction as that on the language so as to prohibit the spending of accumulated surplus. It requires no strained interpretation to say that the term "revenue from all sources for the fiscal year," is broad enough to include accumulated surplus. By such accumulations, public buildings may be constructed and paid for without making a contract in excess of revenues for the fiscal year, and this method would, in the language of the amendment, keep the counties on a "'sound financial basis"—that is to say, out of debt.

Reflection upon the events of the past—the financial history of the counties and municipalities of the State —makes plain what was in the minds of the framers of amendment No. 11 and the people who voted upon it. When the Constitution of 1874 was framed, most of the

counties of the State and many of the municipalities were heavily in debt and scrip was at a discount. This prompted the framers of the Constitution to put in a provision permitting counties and municipalities to issue interest-bearing bonds and to levy an additional rate of taxation to cover indebtedness which existed at the time of the adoption of the Constitution. But it was thought necessary, in order to keep the counties out of debt, to put in a provision absolutely prohibiting counties and municipalities from issuing interest-bearing evidences of debt in the future. It was doubtless in the minds of the framers of the Constitution that the counties and cities would keep out of debt. This proved to be a vain hope. They did not keep out of debt, and it was found that there was no provision in the Constitution to prevent them from going in debt. Notwithstanding the inhibition against issuing interest-bearing evidences of debt, counties and municipalities found a way to float future evidences of indebtedness without there appearing upon the face of the obligations a provision for the payment of interest. Many of the counties again got heavily in debt, as well as the larger cities of the State, and there has been an urgent demand for the enactment of a constitutional amendment permitting counties and cities to issue bonds. The people in subsequent elections demonstrated their unwillingness to confer upon counties and municipalities a continuing power to issue bonds, but at last by amendment No. 11 they conferred authority to issue bonds and levy additional taxes for the purpose of paying indebtedness existing at the time of the adoption of the amendment. It was intended to carefully guard the situation by not only prohibiting counties and cities and towns from issuing more scrip than could be absorbed by the revenues for a given fiscal year, but they put in this provision prohibiting contracts which would incur indebtedness in the future.

It seems to me that the interpretation now placed upon the language of the amendment thwarts the

expressed will of the people who framed the amendment and adopted it. The decision of the majority is, I must say—though I say it with great respect—founded upon the doctrine of necessities, that is to say, what appears to them to be the necessities of the situation. It is another verification of the maxim that "necessity hath no law."