JOHNSON *v.* DERMOTT (1)

No. 4-3582

PARKER *v.* LITTLE ROCK (2)

No. 4-3581

Opinion delivered October 22, 1934.

*Golden & Golden,* for appellants.

*John Baxter, John Sherrill* and *Frank Wills,* for appellees.

*Fred A. Isgrig* and *Harry Robinson,* for appellant.

*Ed. I. McKinley, Jr.,* and *Carl F. Jaggers,* for appellees.

BUTLER, J. In the case first styled, the appellants, who allege that they are owners of real estate in the city of Dermott, brought suit against the mayor and recorder and members of the city council of Dermott, and against A. Prothro, as the only surviving member of the Board of Waterworks Improvement District No. 1 and of Light District No. 1 of the city of Dermott, to enjoin

the performance of a contract between the city of Dermott and the Federal Emergency Administration of Public Works in Washington, D. C.

On the same day the complaint was filed, the appellants filed an amendment thereto, and to the complaint as amended appellees demurred. The demurrer was sustained, and the appellants, electing to stand on the allegations of their complaint, have appealed.

The substantial allegations admitted by the demurrer to be true are these: In 1903 the city of Dermott granted to W. H. Lephiew an exclusive franchise to construct a water and light system within its borders, and on the 15th day of January, 1908, for value, the city procured the cancellation of the franchise and took over the equipment and distribution system constructed by Lephiew to furnish water and light to the city. In the same year two improvement districts were organized each including the entire area within the corporate limits of the city, styled respectively, Water Improvement District No. 1 and Light Improvement District No. 1. Assessments of benefits were levied to construct each improvement, and in 1909 bonds were issued and sold by the districts in the aggregate sum of $23,000. A small part of the assessments was collected, the exact amount of which it is impossible to ascertain. However, there could have been not more than one annual assessment of benefits collected, as the city took over the improvements in 1909, since which time no other assessments have been collected.

On the 13th day of March, 1929, the city purchased six acres of land, the conveyance being made to the "Incorporated Town of Dermott, its successors or assigns." On this property the city dug the wells and erected the tank for the storing of water to be distributed to its citizens and built a brick building for housing the light plant. The purchase money for the Lephiew franchise, the equipment installed by him, and the six acres of land was derived from, and paid out of, the general revenue of the city. Since 1909 the city has operated both the water and light systems as municipal enterprises without objection from any source and without collecting

further assessments of benefit and has paid the bonded indebtedness and all other obligations of the districts out of the general revenues of the city. Beginning with the year 1909, and since that year, the city applied the income derived from the water and light systems to the general revenues of the city, and as it grew it extended the facilities of both plants commensurately, so that now these systems are worth in excess of $100,000, and, since 1909, the improvement districts have not attempted to function in any particular.

The city of Dermott, on November 29, 1926, entered into a lease agreement with the Arkansas Power & Light Company to maintain and operate the light plant and to furnish the service for which it was designed. This contract is now in force, and the light plant is being operated under the provisions of this lease.

From these allegations, it appears that the city of Dermott is not operating the water and light systems as trustee for the improvement districts, but as owner, and such it appears to be in fact.

The city applied to the Federal Emergency Administration of Public Works at Washington, D. C., for a loan from the proceeds of which it is proposed to construct a city hospital. The application for the loan has been approved, and it was required of the city that it enact an ordinance embodying therein the terms of the contract upon which the loan was to be made. Pursuant to this requirement city ordinance No. 442 was duly enacted, which recites at length the terms of the loan and the manner of its disbursement and repayment. Upon the question of the security therefor, the contract, as it appears in the city ordinance above referred to, contains the following recital: "(h) Security. Special obligations of the borrower, secured by a first lien upon, and payable from, a first pledge of the gross revenues of the municipal waterworks system, after deduction of reasonable operation, maintenance, and repair expenses, and additionally secured by a first pledge of the lease rentals from the municipal electric light system."

Plaintiffs seek to enjoin the erection of the hospital under the provisions of the ordinance, and question the

power of the city to make the contract which it evidences, or to give the pledge for the repayment of the loan recited above. The complaint praying that relief recites the fact that, since taking over the two plants and discharging their obligations, the city has used for its own purposes the revenues derived from the plants in excess of the cost of maintenance and operation, and that it is proposed to devote and pledge this excess to the repayment of the Federal loan.

It may be said that it is the city's duty to see that these plants are maintained and operated, and that it may not apply to any other municipal purpose any of the revenues derived from these plants, or either of them, required for the purpose of maintenance and operation. But it may also be said that the loan agreement and the city ordinance recognize this obligation and pledge only the excess revenues "after deduction of reasonable operation, maintenance, and repair expenses" of the waterworks system. The lease of the light plant imposes these charges on the lessee, Arkansas Power & Light Company, as a part of the consideration for that lease, so that no sum is pledged until these charges have been first paid.

It is also alleged in the complaint that the city has been using, and proposes to use, as a part of its general revenue, the profits derived from the operation of these plants after maintenance has been provided for. We know of no constitutional or statutory objection to this being done.

In the case of *Bourland* v. *Southard,* 185 Ark. 627, 48 S. W. (2d) 555, it was alleged that a city improvement district of the city of Fort Smith had improved a street in that city with the proceeds of a bond sale. The city commissioners were ex-officio commissioners of the city improvement district in that city, and had taken over the maintenance of the street as a part of their statutory duty. All the obligations of the district had been paid, including the bonds which it had issued, and there remained on hand about $1,200 which had been derived from the collection of betterment assessments against the real estate located in the city improvement district. The city was using this money along with the general

revenue for general city purposes, and the owners of property within the improvement district brought suits for an accounting of the revenues of the district and to restrain their diversion. In granting the relief prayed it was there said that the property owners in a local improvement district have an interest in the funds of the district, and that it is an impairment of their vested rights to divert the betterment assessments which had been collected to uses other than for the benefit of the owners, and that "the commissioners cannot therefore lawfully expend any of the money of the improvement district for general expenses of the city or for paying employees or officers of the city. If they could require the improvement district to pay any part of the expenses of the city, they could require it to pay all. The taxpayers of the district can be required to pay the assessments only because their property is benefited equal to the amount they have to pay."

We have before us an entirely different question in the instant case. There is involved here no issue of the improper diversion of betterment assessments, as no assessments of betterments are being collected against the property in the district and none have been for a number of years past. In the discharge of the duty to maintain and operate, the city has a discretion as to the manner in which that duty shall be discharged. If the plants are operated at a loss after the city has taken over their operation, it must bear that loss. If a profit is derived after maintenance and operation expenses have been paid, it may use that profit for its general purposes. This profit may, therefore, be treated as a part of the city's income. It was expressly held in the case of *Cumnock* v. *Little Rock*, 154 Ark. 471, 243 S. W. 57, that a city has the power to erect a city hospital, and it may use this general revenue to pay the expenses incurred in that behalf.

We conclude, therefore, that it is not beyond the power of the city to enter into a contract to erect a hospital and to segregate the revenues arising from the water and light systems and to pledge these excess revenues for that purpose. But this power may not be exer-

cised in violation of Amendment No. 10 to the Constitution. Any contract which the city makes in regard to uncollected revenues from any source must be construed with reference to this amendment. Parties cannot, by pleadings or stipulations of any kind, abrogate this amendment which will be read into any contract which the city may make. This amendment provides that the fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and that no allowance shall be made "for any purpose whatsoever in excess of the revenues from all sources for the fiscal year in which said contract or allowance is made." Beyond this inhibition there is a lack of power to contract.

We have considered this amendment as applied to a great variety of questions, and it will serve no useful purpose to review these cases. In one of them—that of *Polk County* v. *Mena Star Co.,* 175 Ark. 76, 298 S. W. 1002—we considered the question of the priority of a county's obligations where it was unable to pay them all, and we there held, in effect, that those expenses must be first paid which were incurred in the discharge of the essential functions of the county government. We there said that such expenses as assessing and collecting taxes, holding courts, and feeding and keeping prisoners, and certain other obligations which are authorized and imposed by statutory mandate, must be paid before other expenses, even though permissible—if the county could pay for them—but which are not indispensable, may be paid for.

And so also with the cities of the State. They cannot contract away their right to exist and to perform the essential functions for which they do exist. These essential expenses must first be paid. When they have been paid, other revenues not exceeding the total annual revenues may be devoted to other public purposes—such as erecting a hospital.

In this connection it may be said that the complaint alleges that the city has a contract for the maintenance of the hospital after its erection without cost to the city, but the city does propose to borrow money for the purpose of erecting the hospital and to repay it in the

manner indicated. It has this authority provided in so doing it does not impair its power to perform the essential functions of its government and existence.

Upon the assumption that the city will have the revenue under the allegations of the complaint which the demurrer filed thereto admits, the decree overruling the demurrer is sustained.

What we have just said disposes of the appeal in the case of *Parker* v. *Little Rock*. That case involves the application of the city of Little Rock, a city of the first class, for a Federal loan with which to construct and equip an airport and the suit, in that case, sought to enjoin the city from entering into a contract with Federal Emergency Administration of Public Works to obtain a loan for that purpose.

Act No. 135 of the Acts of 1929 (Acts of 1929, page 705) authorizes cities of the first class to own, maintain, and operate airports in the manner therein provided. The city of Little Rock appears to have availed itself of the provisions of this act, and now proposes to borrow money, as above stated, for use in the proper equipment of its airport. To repay this loan, the city proposes to pledge the earnings of the airport and to transfer money from its general revenue fund to an airport fund in the event the revenue of the municipal airport will not be sufficient to pay the expenses of operation and maintenance, and also to pay $3,800 per annum from its general revenue fund, or so much thereof as may be necessary, to repay the proposed loan. The city may do this, but in the event only, as herein previously stated, that it has this money after paying the expenses of its municipal government incurred in the performance of its essential statutory functions.

Subject to this limitation, the decree in each case is affirmed.

JOHNSON, C. J., (dissenting). Because of its insidious characteristics, cancer is said to be the worst enemy to mankind extant. So it is with judicial interpretations and manipulations of constitutional mandate. These cases are notable examples of this insidious and malignant growth.

*Davis* v. *Gaines,* 48 Ark. 370, 3 S. W. 184, is a fair example of the beginning of this malignant disease, and our reports from volume 130 until now are full of outrages perpetrated by reason thereof. Although innocent in the beginning, this court found itself in a position from which it could not extricate itself, and the final result was that the farm lands of this State were bonded for millions of dollars which wrought bankruptcy and ruin to a great majority of our overwhelming farm population. Another notable example of judicial construction to promote expediency is *Kirk* v. *High,* 169 Ark. 152, 273 S. W. 389, wherein this court determined that future county revenues might be pledged to secure funds to construct courthouses in the teeth of the fact that this was expressly prohibited by Amendment No. 11 to the Constitution of 1874. It is now a demonstrated fact that a serious mistake was effected by reason of this opinion, and that the simple upholding of the amendment would have resulted in benefit to all. Other examples might be cited but these will suffice to demonstrate the wisdom of following constitutional mandate. To halt these conditions the Legislature of this State, as agent for the people, has been busy for the past several years in an honest endeavor to bring prosperity out of desolation and ruin. The people took upon themselves the task and promulgated constitutional amendments to check this condition of affairs of which Amendment No. 13 of the Constitution of 1874 is a worthy example. Section 1 of this amendment, in part, provides:

"Neither the State nor any city, county, town or other municipality in this State shall ever lend its credit for any purpose whatever; nor shall any county, city, town or municipality ever issue any interest bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the indebtedness existing at the time of the adoption of the Constitution of 1874, and the State shall never issue any interest-bearing treasury warrants or scrip. Provided that cities of the first and second class may issue, by and with the consent of a majority of the qualified electors of said municipality voting on the question

at an election held for the purpose, bonds in sums and for the purposes approved by such majority at such election as follows:''

Although this amendment was approved by a majority of the people in this State on October 5, 1926, its wholesome provisions have been ignored in the majority opinion.

It appears from the language of the amendment that no bonds may be issued by a municipality in this State save by a vote of the people who are called upon to pay the bills. The majority seem to be of the opinion that, merely because the bond issue here complained of is not violative of Amendment No. 10 of the Constitution, this is all-sufficient. It occurs to me that Amendment No. 13, which is later in point of approval, is of equal importance to that of Amendment No. 10 and should not be ignored under the circumstances here presented.

My conception of constitutional government is that the will of the people is supreme, and when the people have spoken out upon any subject their will should not be ignored. Governments are instituted for the protection of the will of its people, and this is true, even though such expressed will of the people may abolish our sacred form of government. Section 1 of art. 2 of the Constitution of 1874 provides:

''All political power is inherent in the people and government is instituted for their protection, security and benefit; and they have the right to alter, reform or abolish the same in such manner as they may think proper.''

I assert without fear of contradiction that the people had the inherent right to promulgate and pass Amendment No. 13 and thereby prohibit municipalities in this State issuing bonds except by a vote of the people, and, since they have done so in no uncertain terms, their will should be respected by the courts.

In the Little Rock case thousands of dollars of the general revenue of the city is pledged to pay this bond issue. The will of the people of Little Rock has never been consulted about this pledge. I can not conceive of a more deliberate violation of constitutional mandate.

Likewise, in the Dermott case, general revenue is pledged over a term of years to pay a bond issue about which the citizenship of Dermott was never consulted.

The majority opinion is bottomed upon the case of *Cumnock* v. *Little Rock,* 154 Ark. 471, 243 S. W. 57. A sufficient answer to the applicability of this case is that it was decided on July 3, 1922, and Amendment No. 13 did not become effective until October 5, 1926, more than four years after the rendition of the opinion in this case.

My conception of the law is that Amendment No. 13 provides a plain, adequate and exclusive remedy to municipalities for the purpose therein indicated. No subterfuge should be tolerated by the courts to avoid its plain mandate.

The views here expressed in no wise conflict with previous holdings of this court, to the effect, that municipalities may pledge future revenues accruing from a new improvement when such indebtedness created the improvement, but, when general revenues of the municipalities are pledged, a very different question is presented.

For the reasons stated, I respectfully dissent.

I am authorized to say that Mr. Justice MEHAFFY concurs in my views.