MATHERS *v.* MOSS, MAYOR.

4-6445                                          151 S. W. 2d 660

Opinion delivered May 26, 1941.

*I. N. Moore,* for appellant.

*Pat H. Mullis,* for appellee.

SMITH, J.   The council of the city of Dumas passed Ordinance No. 120, having a preamble reading as follows: The city of Dumas owns a waterworks system, and the public interest and necessity require that extensions and improvements be made to such system. The city council has caused to be made plans and specifications for such extensions and improvements, an estimate of the construction cost, an estimate of the reasonable rates necessary to be charged for services by said system, and an estimate of the revenues of such system, all of which have been filed with the city clerk. The council has caused an estimate to be made of the value of the existing plant and the value of the proposed improvements and exten-

sions, which have been filed with the city clerk. The council has examined and approved these plans and estimates, and finds it to the best interest of the city that the improvements and extensions be made. The city is without funds to execute these plans, but the funds may be had from the proceeds of bonds to be issued under the authority of act 131 of the Acts of 1933, as amended by act 96 of the Acts of the regular 1935 session of the General Assembly.

It was thereafter enacted that the cost of said improvements and extensions was found to be $9,000, and that the city should proceed with the construction of a system in accordance with the plans and specifications approved by the council. The construction, custody, operation and maintenance of the entire waterworks system and the collection of the revenues therefrom shall be effected and supervised by the city council, which shall make all contracts necessary and incidental to the execution of these powers. Rates for water to various users are fixed.

The ordinance finds the value of the existing waterworks system to be $36,000, and the value of the extensions and improvements will be $9,000. The council "further finds and declares that such rates as above set out will produce a total revenue in such amount that twenty (20%) per cent. of said revenues will be sufficient to provide for the payment of the bonds, both principal and interest, as the same fall due and are payable, to pay the *pro rata* share of the repair and maintenance expenses, and to create all funds hereinafter described." It is then enacted that the rates shall never be reduced below an amount "sufficient to provide for the maintenance of the funds hereinafter described, and if necessary shall be increased in an amount sufficient to provide for the maintenance of said funds." It is provided that a schedule of rates shall be kept on file in the office of the city clerk and in the office of the waterworks system, open to the inspection of all persons interested. Free service to any one is denied. The city itself and all its agencies are required to pay for service. The revenues so received

shall be deemed to be revenues derived from the operation of the system and used and accounted for as other revenues must be.

The revenues must be deposited with the city treasurer, who is required to give a special bond. It is required that the treasurer of the city shall deposit twenty per cent. (20%) of all the revenues of the entire system in a separate fund to be administered as follows:

"(A)    An amount sufficient to pay the reasonable and necessary expenses of operation, repair and maintenance of the extensions and improvements herein set out shall be deducted from the monthly revenues as they accrue and shall be used to pay such expenses."

"(B)    All the revenues remaining after the payment" required by sub-paragraph (A) "shall constitute twenty per cent. (20%) of the net revenue of the entire system, and a sufficient amount of such twenty per cent. of the net revenues is hereby set aside and pledged to be paid at monthly intervals, in approximately equal installments into a bond fund to provide for the payment of:" (1) interest; (2) fiscal agency charges; (3) bonds as they mature; (4) margin for safety, "which margin, together with any unused surplus of such margin carried forward from the preceding fiscal year, shall equal ten per centum of all other amounts so required to be paid into the bond fund."

"(C)    If a surplus remains after the requirements of sub-paragraphs (A) and (B) have been met, the council may transfer all or any part of the balance of said twenty per cent. (20%) of the net revenues of the entire system, after reserving an amount deemed to be sufficient for operating, repair and maintenance for an ensuing period of not less than twelve months and for depreciation into the bond fund or into a fund for further extensions, betterments and additions to the system."

That so long as any of the bonds are outstanding, the system shall be operated upon a fiscal year basis, the first year to begin April 1, 1941.

Bonds designated "The City of Dumas, Arkansas, 5% Water Revenue Bond," are to be issued in the sum

of $9,000. Forms for the bonds and for the interest coupons to be attached are given, and it is provided that "The bonds, together with interest thereon, shall be payable out of the bond fund as hereinbefore defined, and shall be a valid claim of the holder thereof against the bond fund and shall constitute a statutory mortgage lien against the improvements and extensions herein provided, and the amount of the revenues pledged to said fund, which amount of said revenues is hereby pledged for the equal and ratable payment of the bonds and shall be used for no other purpose than to pay the principal and interest of the bonds as the same become due and payable."

The manner of sale of bonds is provided, with the restriction that the proceeds shall be used solely for the payment of construction costs, provided that the interest for the first six months on the bonds may be paid from the proceeds of sale.

Various other provisions are found in the ordinance intended to safeguard the bond issue, and, among others is the provision that if default occurs water rates may be increased.

Appellant, a citizen and taxpayer of the city of Dumas, has attacked this ordinance on various grounds, and prayed that the officers of the city charged by the ordinance with the duty of enforcing and performing its provisions be enjoined from proceeding thereunder. The city filed an answer to plaintiff's complaint, to which answer plaintiff filed a demurrer. The demurrer to the answer was overruled, and the plaintiff electing to stand on his demurrer, the complaint was dismissed as being without equity, and this appeal is from that decree.

We do not recite the allegations of the complaint and the responses contained in the answer, but will summarize them in the discussion of the questions raised by the pleadings.

It appears that the plans approved by the city council and referred to in the ordinance contemplate the extension of the water mains to a tract of land, contain-

ing thirty-five acres, owned by the city, a distance of one and two-tenths miles beyond the city limits. It appears that the Federal Government proposes to establish on this land a National Youth Administration Residency, which, it is alleged, will be of great benefit to the city of Dumas. Water will be sold to the residency. It further appears from these plans that the city proposes also to extend the sewage system to the residency, and to make connection with the city's sewage treatment plant, so that, when the plans have been executed the residency will have both water and sewage facilities. It was determined in the ordinance that the cost of furnishing these facilities to the residency will be $9,000, of which $2,000 will be the cost of the sewage extension.

It was ascertained and the fact declared in ordinance 120 that the now existing value of the waterworks system is $36,000, and the value and cost of the proposed extensions is $9,000, making a total value of $45,000, of which the $9,000 additional is twenty per cent. It is proposed to issue $9,000 of revenue bonds to pay the construction cost of these extensions under the authority of act 131 of the Acts of 1933, as amended by act 96 of the Acts of 1935, which appear as §§ 10001, et seq., Pope's Digest.

This act 131 was held to be constitutional in the case Snodgrass v. Pocahontas, 189 Ark. 819, 75 S. W. 2d 223, except the provision exempting the revenue bonds from general taxation. It was there held that Amendment No. 13, prohibiting the issue of bonds by municipalities except for the purposes and in the manner there provided did not apply to bonds payable solely from the revenues of the agencies authorized to issue these bonds, commonly called revenue bonds.

Act 132 of the Acts of 1933, appearing as §§ 9977, et seq., Pope's Digest, authorizes the issuance of revenue bonds to pay for sewage plants, and this legislation has also been held valid. The following cases have upheld the exercise of the powers conferred by these statutes: Snodgrass v. Pocahontas, supra; Jernigan v. Harris, 187 Ark. 705, 62 S. W. 2d 5; Bourland v. Fort Smith, 190 Ark.

289, 78 S. W. 2d 383; *McGehee* v. *Williams*, 191 Ark. 643, 87 S. W. 2d 46; *Ringgold* v. *Bailey*, 193 Ark. 1, 97 S. W. 2d 80; *Terry* v. *Overman*, 194 Ark. 343, 107 S. W. 2d 349; *Johnson* v. *Russell*, 198 Ark. 49, 127 S. W. 2d 260; *Carpenter* v. *City of Paragould*, 198 Ark. 454, 128 S. W. 2d 980; *Sewer Imp. Dist. No. 1 of Sheridan* v. *Jones, Adm'x*, 199 Ark. 534, 134 S. W. 2d 551; *North Little Rock Water Co.* v. *Water Works Commission of Little Rock*, 199 Ark. 773, 136 S. W. 2d 194.

It is under the authority of act 131—and not of act 132—that the bonds here in question are to be issued.

The city's waterworks system, and its sewage system, were constructed by separate improvement districts. The complaint alleges, and the answer admits, that the waterworks district has retired its bonds, and now owes no debts, and the plant is being operated by the city. The sewer improvement district also issued bonds, of which $28,000 remain unpaid.

For the reversal of the decree appealed from, appellant cites the case of *Town of Jacksonport* v. *Watson*, 33 Ark. 704, in which the town was enjoined from using municipal funds to operate a ferry without the limits of the municipality. It was held in that case that no statute had granted the power to municipalities to thus expend corporate funds. Here, it is not intended that corporate funds shall be expended, except, indeed, the profits above operating expenses and maintenance cost of the waterworks system, which, as was held in the case of *Johnson* v. *Dermott*, 189 Ark. 830, 75 S. W. 2d 243, the municipality might use for purposes not related to the plant from which the profits had been derived, in that case to build a hospital.

We have held that municipal corporations have the authority to extend water mains beyond the corporate limits to obtain an adequate water supply, or may obtain an outlet for sewage beyond the corporate limits. *Bourland* v. *Fort Smith*, 190 Ark. 289, 78 S. W. 2d 383; *Sewer Imp. Dist. No. 1 of Sheridan* v. *Jones, Adm'x*, 199 Ark. 534, 134 S. W. 2d 551. And if, from a source of supply beyond the corporate limits, a surplus of water is ob-

tained, this surplus may be sold. *McGehee* v. *Williams,* 191 Ark. 643, 87 S. W. 2d 46; *North Little Rock Water Co.* v. *Water Works Commission of Little Rock,* 199 Ark. 773, 136 S. W. 2d 194.

In the case of *Arkansas Utilities Co.* v. *City of Paragould,* 200 Ark. 1051, 143 S. W. 2d 11, the city proposed to extend its electric light lines to serve a rural community under the authority of § 2108, Pope's Digest, which reads as follows: ''Municipalities now owning or operating facilities for supplying a public service or commodity to its citizens may, with the approval of the Department (of Public Utilities) granted after hearing, extend its service into the rural territory contiguous to such municipality and put into effect such reasonable rules and rates for such rural service as may be from time to time approved by the Department.''

The city of Paragould had applied to the State Department of Public Utilities for permission to thus extend its light lines, and that permission had been denied, but the city sought to extend its lines without this permission. It was held that this right was dependent upon the statute quoted, and that but for the statute the municipality would have no right to construct and operate the lines outside the city limits, even with the consent of the Department.

After stating the general powers which municipalities have, and the restrictions upon such powers, we there said: ''We know of no other statute, and the diligence of counsel has disclosed no other, giving municipalities the express power to extend their electric facilities to rural communities, outside the city limits, and we can see no reason to imply such powers as an incident to operations within, especially where such rural communities are already being served. We can see many reasons *contra.* For instance, if it should be held that such extension rendered the municipal plant a public utility as to its operations outside, it would of necessity assume all the burdens and liabilities of a public utility, such as taxation, continuity of service, liability for tort actions, and the like.''

There is, of course, no distinction in principle between furnishing electricity and furnishing water or sewage facilities.

The answer alleged, and the demurrer thereto admits, that before constructing these extensions, the city will obtain the consent both of the State Board of Health and the Department of Utilities. It is, therefore, insisted, upon the authority of the cases cited, that the city has the authority to proceed with the construction of its water mains to the residency, and to extend sewage service to the residency by the extension of its sewer lines.

But to so hold would be to go a step further than we have yet gone, and if it were so held there would appear to be no restraint upon municipalities engaging generally in utility services not restricted to their own inhabitants.

Here, it is to be remembered that it is proposed to extend water mains one and two-tenths miles beyond the city limits, not to obtain a water supply for the inhabitants of the city, but to sell water to the residency; nor is this a case where the city is proposing to sell a surplus above its own needs; nor is it a case of the city going beyond its own borders to obtain an outlet for sewage disposal. It is the case of a city going beyond its own limits to furnish water and sewage facilities to another community—the residency—because it was found and declared in the ordinance that the city would profit by doing so. It must also be remembered that this is not a case like that of *Johnson* v. *Dermott, supra,* where the waterworks system had been fully paid for, and its net earnings were devoted to another municipal purpose, that of erecting a hospital. *Cumnock* v. *City of Little Rock,* 154 Ark. 471, 243 S. W. 57, 25 A. L. R. 608. The extensions here proposed have not yet been made, and so far from their being paid for, bonds are to be sold to provide money to construct them.

The cost of constructing the sewage extension is to be imposed upon the waterworks system, and twenty per cent. of the net revenue of the enlarged system is to be segregated and held for the payment of the proposed bond issue. This twenty per cent. of the net revenue of

the waterworks system may or may not suffice to produce sufficient money to pay the bonds and the interest thereon at maturities, in which event the ordinance provides that the water rates may be sufficiently increased to meet these payments. The Federal Government, in establishing the residency, has assumed no obligation to maintain it, and will only be required to pay for the services so long as it uses them. But the obligation to pay the bonds will continue, as will also the lien upon the extensions for which the ordinance provides.

Act 132 of 1933, appearing as §§ 9977, *et seq.,* Pope's Digest, contemplates that revenue bonds authorized to construct sewers will be paid from the revenues derived from that service. Likewise, act 131 of 1933, appearing as §§ 10001, *et seq.,* Pope's Digest, contemplates that the revenue bonds authorized to construct waterworks shall be paid from the revenues derived from that system. There is nothing in either act which authorizes any part of the revenues derived from one system to be devoted and appropriated to pay the cost of construction or operation of the other.

We are constrained, therefore, to hold that the city proposes to confer and supervise powers not authorized by law, and the decree will, therefore, be reversed, and the cause remanded with directions to sustain the demurrer to the answer.